**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **Erie Insurance Company,** | : | |
| **Plaintiff,** | : | **Civil Action 2:12-cv-00703** |
| **v.** | : | |
| **Sunbeam Products, Inc.,** | : | **Magistrate Judge Abel** |
| **Defendant.** | : | |

**<u>OPINION AND ORDER</u>**

This is an action for products liability brought by plaintiff Erie Insurance Company
("Erie") against defendant Sunbeam Products, Inc., for damages allegedly resulting from a fire
caused by a Holmes model HCH 6150 space heater manufactured by defendant.  The action was
filed in the Court of Common Pleas for Fairfield County, Ohio, on July 3, 2012, and was
removed to this Court on August 3, 2012, as one arising under the Court's diversity jurisdiction.
*Notice of Removal*, ECF 2.  This matter is now before the Court, with the consent of the parties
pursuant to 28 U.S.C. § 636(c), for consideration of defendant's motion *in limine*, ECF 40, and
defendant's motion for summary judgment, ECF 42.  Plaintiff has filed a joint response to both
motions, *Plaintiff's Response*, ECF 44, and defendant has filed a joint reply, *Defendant's Reply*,
ECF 45.  This matter is now ripe for decision.

**I.     Background**

Michael and Alisha Baer purchased the house at 335 Lake Road, Lancaster, Ohio (the
"premises"), new from the home builder and moved into the house in May or June 2005.

*Michael Baer Deposition*, attached to *Plaintiff's Response* as Exhibit A, at *PAGEID* 744, 749-51. The Baers had the basement finished in early 2006.  *Id*. at *PAGEID* 754-55.  The basement had a home office, living room, utility room, cedar closet, bathroom, and bedroom.  *Id*. at *PAGEID* 757-59, 805; *Plaintiff's Response*, Exhibit 2.

Mr. Baer had his secretary purchase a heater in December 2006 from Target to use at the premises.  *Michael Baer Deposition*, *PAGIED* 779-81, 785, 789.  The heater was used from mid-September through April for approximately two to four hours a day.  *Id*. at *PAGEID* 783-84.  Mr. Baer's sister occupied the basement bedroom for the six month period ending in May 2010, and she used the heater during the winter months.  *Id*. at *PAGEID* 791-92.  In addition to the heater, there was a refrigerator, desk, bed, stereo, lamp, and files for Mr. Baer's business in the bedroom.  *Id*. at *PAGEID* 792-93, 807.  Mr. Baer believes that he was the last person to use the heater in the bedroom. He used it while filing papers.  *Id*. at *PAGEID* 807.

Aside from having the basement finished, the Bears never had any other repairs or improvements done on the premises prior to October 2010, and there were no issues with circuit breakers tripping.  *Id*. at *PAGEID* 755-56.  On October 20, 2010, Mr. Baer worked in the basement office from 9:00 a.m. until 11:00 a.m., when he went out to lunch with his wife and children.  *Id*. at *PAGEID* 803.  The Bears returned around 1:00 p.m., and were greeted by thick smoke when they opened the garage door; Mr. Baer closed the door and called 911.  *Id*. at *PAGEID* 800, 812-13.

The Richland Township Fire Department responded to the fire and was assisted by the Pleasant Township Fire Department.  *Assistant Chief Ryan Wyse Deposition* ("*Wyse Deposition*"), attached to *Plaintiff's Response* as Exhibit 4, at *PAGEID* 870-72.  The fire was

contained in the basement and had self-extinguished by the time the fire departments arrived. *Id*. at *PAGEID* 883-86, 888.  The fire department overhauled and ventilated the house to make sure the fire had not spread. *Id*. at *PAGEID* 887, 894.  Assistant Chief Wyse testified that he (and others) thought the fire started in the basement bedroom at or about where the space heater was located. *Id*. at *PAGEID* 897-912.  He also testified that the homeowner said the heater "was off," but that he understood the heater was still plugged in at the time of the fire. *Id*. at *PAGEID* 904. The Pleasant Township Fire Department report identifies a space heater in the basement bedroom as the cause of the fire. *Plaintiff's Response*, Exhibit 3.  Captain Andrew Slivka of the Richland Township Fire Department testified that the origin of the fire was in the basement bedroom and that he saw a V-pattern on the same wall that the space heater was on, but that he did not remember where the space heater was positioned on that back wall. Moreover, he was not qualified to determine the cause of the fire. *Captain Andrew Slivka Deposition*, ECF 44-5, *PAGEID* 984-85, 989-92, 1007-08.

Mr. Baer reported the fire to Erie, his insurance company on the date of the fire. *Michael Baer Deposition*, *PAGIED* 761-62, 764-65.  Erie retained Casalinove Investigations, Inc., to determine the origin and cause of the fire. *Casalinova Report*, attached to *Plaintiff's Response* as Exhibit 6, Doc. 44-6, *PAGEID* 1028.  Rick Pletcher of Casalinova Investigations, Inc. performed an initial investigation at the premises on October 21, 2010. *Id*. at p. 4, *PAGEID* 1031.  Mr. Pletcher returned to the premises with Matthew Gardner on October 22, 2010, to reconstruct the scene, document the electric, and secure evidence. *Id*.  Mr. Pletcher and Mr. Gardner eliminated "[n]atural type fire causes," and noted that there "was no evidence of an intentionally set fire." *Id*. at pp. 5, *PAGEID* 1032.  The house electrical wiring and the refrigerator and desk lamp in the

3

basement bedroom were eliminated as potential causes of the fire.  *Id*.  There was no sign of carelessly discarded smoking material, no evidence of candles in the basement bedroom, and the stereo in the basement bedroom showed no sign of a failure or malfunction.  *Id*.  "The space heater was inspected and could not be eliminated as to the cause" of the fire.  *Id*.  Mr. Pletcher and Mr. Gardner concluded that the fire originated in the basement bedroom "in the area of the space heater located centrally near the north wall."  *Id*.  They further concluded that, "based on the elimination and absence of all other heat sources in the area of origin, characteristics of this fire loss, and statements made by the insured, . . . the *most likely cause of this fire was a failure or malfunction of the space heater*."  *Id*. (emphasis in original).  It was noted that "further destructive analysis of the space heater [would be] required to determine the specific cause of this fire."  *Id*., p. 5, *PAGEID* 1033.

Erie retained Mid-West Forensic Services "to perform a non-destructive, Computed Tomography (CT) scan of debris" recovered from the fire.  *Mid-West Forensic Services Report*, attached to *Memorandum in Support of Defendant's Motion in Limine*, ECF 41, as Exhibit K, ECF 41-11, *PAGEID* 662.  Fred Hackett, CT Analysis and Senior Fire Investigator, and Michael Parker ("Parker"), Forensic Engineer, of Mid-West Forensic Services analyzed some of the debris from the fire, performed a CT scan of the space heater, and prepared a report identifying "an electrical event within the electric heater" as the cause of the fire.  *See id*.

## II.    Defendant's Motion *in Limine*

Defendant has filed a motion *in limine*, asking that the Court exclude the report and testimony of plaintiff's expert, Michael Parker.

### A.    Standard

4

The purpose of a motion *in limine* is to ensure the evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible.  *See Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997); *Ohio Willow Wood Co. v. Alps S., LLC*, No. 2:04-cv-1223, 2014 WL 3734342, at *1 (S.D. Ohio July 29, 2014).  A court should exclude evidence on a motion *in limine* only when that evidence is determined to be clearly inadmissible on all potential grounds.  *Ohio Willow Wood Co.*, 2014 WL 3734342 at *1 (quoting *Weimer v. Honda of Am. Mfg., Inc.*, No. 2:06-cv-844, 2008 WL 4332525, at *1 (S.D. Ohio Sept. 17, 2008) *aff'd,* 356 F. App'x 812 (6th Cir. 2009)).  When a court is unable to determine whether or not certain evidence is clearly inadmissible, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in the proper context.  *Id*. (quoting *Weimer*, 2008 WL 4332525 at *1).  Whether or not to grant a motion *in limine* falls within the sound discretion of the trial court.  *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 562 (6th Cir. 2012) (citing *United States. v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999)).

**B.    Discussion**

Defendant's motion *in limine* request that the Court exclude the testimony and report of plaintiff's expert, Michael Parker.  Rule 702 of the Federal Rules of Evidence governs the use of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

5

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 confers upon trial judges the role of "gatekeeper" when considering the use of expert testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

This Court has previously explained its gatekeeping role:

> The trial court's gate-keeping role is two-fold.  First, a court must determine whether the proffered testimony is reliable.  *See Daubert*, 509 U.S. at 590.  The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid.  *Id.*  The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief.  *Id.*  Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir. 1994).
>
> The Supreme Court in *Daubert* set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.  *Daubert*, 509 U.S. at 593–94.  *See also Deal v. Hamilton County Bd. of Ed.*, 392 F.3d 840, 851 (6th Cir. 2004).  The Court in *Kumho Tire* stressed that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability.  *Kumho Tire*, 526 U.S. at 150.  The test of reliability is a "flexible" one, however, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular case.  *Id.* (quoting *Daubert*, 509 U.S. at 593); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470 (6th Cir. 2004).  The particular factors will depend upon the unique circumstances of the expert testimony involved.  *See Kumho Tire Co.*, 526 U.S. at 151–52.
>
> The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue; that is, whether the opinion is relevant to the facts at issue.  *See Daubert*, 509 U.S. at 591–93.  This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial.  *See United States v. Bonds*, 12

6

> F.3d 540, 555 (6th Cir. 1993).  Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant.
>
> The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  The judge's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk and W. Ry. Co.*, 98 F.Supp.2d 919, 923–24 (S.D. Ohio 2000).

*L.S. v. Scarano*, No. 2:10-cv-51, 2011 WL 4948099, at *2-3 (S.D. Ohio Oct. 18, 2011).  Guided by the foregoing, the Court will consider defendant's motion *in limine*.

Defendant does not challenge Parker's qualifications as an expert.  *Defendant's Reply*, p. 7.  Instead, defendant argues that Parker's testimony is unreliable, and should be excluded under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), because he failed to follow the standards in National Fire Protection Association 921: Guide for Fire and Explosion Investigations ("NFPA 921").

"NFPA 921 'is designed to assist individuals who are charged with the responsibility of investigating and analyzing fire and explosion incidents and rendering opinions as to the origin, cause, responsibility, or prevention of such incidents.'"  *Travelers Cas. Ins. Co. of Am. ex rel. Palumbo v. Volunteers of Am. Ky., Inc.*, No. 5:10-cv-301, 2012 WL 3610250, at *2 (E.D. Ky. Aug. 21, 2012) (quoting NFPA 921, ch. 1.1 (2008 ed.)).  "The purpose of NFPA 921 'is to establish guidelines and recommendations for the safe and systematic investigation or analysis of fire and explosion incidents.'"  *Id*. (quoting NFPA 921, ch. 1.2.1).  "NFPA-921 is a recognized guide for assessing the reliability of expert testimony in fire investigations."  *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 849 (N.D. Ohio 2004) (citing *Royal Ins. Co. of Am. v. Joseph*

*Daniel Constr., Inc.,* 208 F. Supp. 2d 423, 426–27 (S.D.N.Y. 2002); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.,* 150 F. Supp. 2d 360, 366 (D. Conn. 2001)).  *See also Volunteers of Am. Ky., Inc.*, 2012 WL 3610250 at *2 (quoting *Thompson v. State Farm Fire and Cas. Co.,* 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008)).

NFPA 921 provides a six step scientific method for determining the cause of a fire, which "includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing a hypothesis or hypotheses, and, most importantly, testing the hypothesis or hypotheses."  NFPA 921, ch. 18.2 (2011 ed.).  To use the scientific method, "the investigator must develop at least one hypothesis based on the data available at the time.  These initial hypotheses should be considered 'working hypotheses,' which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied."  *Id*.  "Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident."  *Id*. at ch. 18.6.2.  "Hypothesis testing may include: any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis."  *Id*. at ch. 18.6.4.  Each hypothesis must be tested "using the Scientific Method.  If one remaining hypothesis is tested using the 'scientific method' and is determined to be probable, then the cause of the fire is identified."  *Id*. at ch. 18.6.

Parker and Hackett performed a CT scan of the electric heater in 2011, which revealed electrical arcing and an anomaly characteristic of arcing.  *Mid-West Forensic Services Report*, *PAGEID* 664.  On January 27, 2012, Parker took part in an examination of the space heater, a

8

stereo, and a remote control to the space heater.  *Id*. at *PAGEID* 664-65.  The examination of the stereo system was found to be largely unremarkable, and "[n]o indications were found to indicate the stereo system was causal to this fire."  *Id*. at *PAGEID* 665.  The remote control was presented "in an undamaged state."  *Id*. at *PAGEID* 666.

A destructive examination of the heater remains revealed several electrical arcs.  "The two-conductor electrical cord for the heater was straightened out and measured approximately 87 inches from where it [was] embedded in the debris to where a termination due to an electrical arc event is present."  *Id*. at *PAGEID* 668.  "During the examination of the mechanical crimp connections and the remaining conductors fastened in them, it was noted that several of the stranded copper conductors ha[ve] individual strands melted together."  *Id*. at *PAGEID* 669.  "Examination of various portions of the wiring in the debris found evidence of electrical arcing in portions of the wiring that were from inside the heater."  *Id*.  Parker also re-examined the CT dataset using updated software and found "three points of electrical arcing from wiring within the heater."  *Id*.  Parker analyzed the wiring using "the Sum Along Ray filtering within the CT imaging viewer" and found "areas where the material composition of the copper conductors has been altered by internal heating."  *Id*. at *PAGEID* 670.  In total, Parker identified seven "electrical events" inside the heater.  *Parker Deposition*, *PAGEID* 595.  Parker provided photographic documentation of the examinations for each item and of the deconstruction of the space heater remains.

In addition to the physical examinations, Parker reviewed the *Casalinova Report*, a portion of defendant's document production, and the depositions of Michael Baer, Pleasant Township Fire Department Captain Michael Hutton, Pleasant Township Fire Department

Captain Andrew Slivka, and Hebron Fire Department Assistant Chief Ryan Wyse.  *Mid-West Forensic Services Report*, *PAGEID* 672.  Parker also reviewed photographs of the fire scene.

*Parker Deposition*, *PAGEID* 597.  Parker concluded that, based on a review of the evidence

> and in accordance with the current direction of *NFPA 921 Guide for Fire and Explosion Investigations* that with a High degree of engineering certainty, the cause of this fire is from an electrical event within the electric heater.  This event was located within the electric heater in spaces not accessible to a consumer eliminating consumer abuse or misuse.  Using engineering principals associated with the analysis of arc mapping, the evidence of arcing found within the heater had to have occurred prior to the arcing event found exterior to the heater on the electrical power cord for the heater.

*Mid-West Forensic Services Report*, *PAGEID* 672.

Defendant argues that Parker's opinion is unreliable because he failed to comply with NFPA 921.  Defendant specifically challenges Parker's application of the scientific method described in NFPA 921, ch. 18.2.  According to defendant, Parker failed to collect and analyze all the data available to him because he failed to speak to Mr. Baer, the firefighters who responded to the fire, or anyone at Casalinove Investigations, Inc.  *Defendant's Reply*, pp. 8-9.  Defendant also argues that Parker failed to review defendant's entire document production, including a document about the flammability characteristics of the plastics used in the heater.  *Id*.  According to defendant, Parker failed to formulate alternative hypotheses, failed to perform any tests, and failed to subject his theory to peer review.  *Id*.; *Memorandum in Support of Defendant's Motion in Limine*, pp. 10-15.

Parker admitted during his deposition that he did not speak to Mr. Baer, the firefighters at the scene, or anyone at Casalinove Investigations, Inc.  He also failed to review defendant's entire document production, including a document about the flammability characteristics of the plastics used in the heater.  Nevertheless, Parker did review Mr. Baer and the firefighters'

depositions, as well as the *Casalinove Report*.  *See Parker Deposition*, *PAGEID* 672.  As to only reviewing a portion of defendant's document production, Parker explained that he was unable to read many of the documents produced by defendant because they were written in Chinese.  *Id*. at *PAGEID* 603-04.  It is also evident that Parker developed and ruled out several hypotheses. Parker considered all the objects he examined as possible causes of the fire, as well as combustibles being too close to the heater, and he was able to rule out other potential causes based on the *Casalinova Report*.  *Id*. at *PAGEID* 610, 647.  Moreover, defendant's arguments to the contrary notwithstanding, *see Memorandum in Support of Defendant's Motion in Limine*, pp. 10-14, Parker tested his theory that an electrical event inside the heater caused the fire.  Parker performed a CT scan of the heater and participated in a deconstructive examination.  As a result, Parker identified electrical arcing and seven total "electrical events" inside the heater.  *Mid-West Forensic Services Report*, *PAGEID* 668-70; *Parker Deposition*, *PAGEID* 595.  Parker explained that the heater, which he described as a "mass" or "melted blob," was damaged such that it could not be determined which arc occurred first.  *Parker Deposition*, *PAGEID* 604.  Parker was, however, able to eliminate the anomaly in the motor armature as the origin of the fire, and he performed arc mapping to the extent that he was able to determine that the internal arcing in the heater occurred before arcing on the power cord.  *Id*. at *PAGEID* 591, 603, 606, 648.  Parker relied on this evidence and his experience, which includes investigating approximately 50 fires where plastic appliances have been ignited or have ignited, to determine that electrical activity within the heater caused the fire.  *Id*. at *PAGEID* 649.

Although Parker did not perform physical experiments to test his hypothesis, NFPA 921 specifically provides that testing is done by the principle of deductive reasoning.  NFPA 921, ch.

11

18.6.2.  NFPA 921 also provides that, in addition to physical testing, testing may be done by analytical techniques and tools and systems analysis.  NFPA 921, ch. 18.6.4.  *See also Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. 3:02-cv-491, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) ("Section 2–3.6 of the NFPA 921 recognizes the process of deductive reasoning as an appropriate methodology for determining the cause and origin of a fire.  The courts have also found deductive reasoning to be credible, scientific reasoning.") (citing *Royal Ins. Co.,* 208 F. Supp. 2d at 427; *Travelers Property & Cas. Corp.,* 150 F. Supp. 2d at 366; *Abon, Ltd. v. Transcon. Ins. Co.*, No. 2004-ca-0029, 2005 WL 1414486, at *10–11 (Ohio Ct. App. June 16, 2005)).

Defendant next argues that Parker's testimony is unreliable because he failed to rule out all potential causes of the fire.  *Defendant's Reply*, p. 4.  Defendant specifically argues that Parker failed to rule out the stereo power cord and items examined during a second evidence exam as possible causes of the fire.  *Id.*; *Memorandum in Support of Defendant's Motion in Limine*, pp. 5, 7, 14.  The stereo power cord was never recovered after the fire, and Parker testified that he was unaware of when the second evidence exam was held, where it was held, or what was evaluated at the exam.  *Parker Deposition*, *PAGEID* 598.  Parker's inability to account for unrecovered or unknown items goes to the weight of his testimony, not its admissibility.  *See Volunteers of Am. Ky., Inc.*, 2012 WL 3610250 at *3; *Ky. Farm Bureau Mut. Ins. Co. v. Hitachi Home Elecs. (Am.), Inc.*, No. 3:08-cv-30, 2009 WL 2589854, at *3 (E.D. Ky. Aug. 20, 2009).  Similarly, "[w]hether additional or alternative testing would undercut or support [Parker's] testimony is a question of the weight to be given his conclusions, which can be addressed at summary judgment or at trial."  *State Farm Fire & Cas. v. Jarden Corp.*, No. 1:08-cv-1506,

12

2010 WL 2541249, at *5 (S.D. Ind. June 16, 2010) (citing *U.S. Automatic Sprinkler, Co. v. Reliable Automatic Sprinkler Co.*, No. 1:07-cv-00944, 2010 WL 1266659, at *3 (S.D. Ind. Mar. 25, 2010)). *See also Indus. Paper & Packaging Corp.*, 2006 WL 1788967 at *4 (permitting an expert fire investigator to testify without performing physical testing).

      Defendant also argues that Parker's testimony should be excluded because Parker did not subject his theories to peer review. *Memorandum in Support of Defendant's Motion in Limine*, pp. 14-15. This argument is misplaced. It is not Parker's causation theory that has to be peer reviewed, but rather the theories underlying the forensic fire investigation standards in NFPA 921, which Parker used to form his causation conclusion. *See Daubert*, 509 U.S. at 593. As discussed *supra*, NFPA 921 "is a peer reviewed and generally accepted standard in the fire investigation community." *Indus. Paper & Packaging Corp.*, 2006 WL 1788967 at *4 (E.D. Tenn. June 27, 2006). *See also Hitachi Home Elecs.*, 2009 WL 2589854 at *4 ("Thus, these scientific theories underlying the forensic fire investigative techniques [in NFPA 921] have already been tested and deemed reliable.").

      "[T]he *Daubert* Court instructed district courts that their primary function as 'gatekeepers' is to determine whether the principles and methodology underlying the testimony itself are valid—not to second guess the validity of conclusions generated by otherwise valid methods, principles, and reasoning." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (internal quotations omitted) (upholding the exclusion of expert witnesses who failed to "test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles"). Considering the foregoing, the Court is satisfied that Parker's testimony is grounded in the generally accepted methodology outlined in NFPA 921

and is more than mere unsupported speculation or subjective belief. Defendant's arguments go to the weight of Parker's opinions and are proper material for vigorous cross-examination. Accordingly, defendant's motion to exclude Parker's testimony and expert report is denied.

## III. Defendant's Motion for Summary Judgment

### A. Standard

The standard for summary judgment is well established. This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Pursuant to Rule 56(a), summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. In making this determination, the evidence "must be viewed in the light most favorable" to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

14

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B. Discussion

This is an action for products liability under the Ohio Products Liability Act, R.C. 2307.71 *et seq*. Defendant argues that plaintiff has failed to put forth evidence of a specific defect in the space heater that caused the fire, and that there is no evidence that a defect existed at the time the heater left the manufacturer. *Memorandum in Support of Defendant's Motion for Summary Judgment*, ECF 43, pp. 4-5. "Without testimony from Michael Parker that a defect existed within the product when it left the manufacturer, Plaintiff will not be able to present to the jury any evidence of a defect and summary judgment must be granted as a matter of law." *Id*.

Plaintiff argues that it need not identify the specific defect within the space heater that caused the fire and that it has provided sufficient circumstantial evidence that the fire originated within the space heater. Plaintiff cites to *State Farm Fire & Cas. Co. v. Chrysler Corp.*, 523 N.E.2d 489 (Ohio 1988), and argues that manufacturing and design defects may be proven by

15

applying the "consumer-expectation standard:" "a product may be proven to be in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Plaintiff's Response*, p. 9.  According to plaintiff, it "need only prove that the space heater did not perform in the way that an ordinary consumer would expect it to perform when used as intended." *Id*.

The consumer expectation standard is derived from Former R.C. § 2307.75(A), which provides as follows:

> (A) . . . [A] product is defective in design or formulation if either of the following applies:
>
> (1) When it left the control of its manufacturer, the foreseeable risks associated with its design or formulation as determined pursuant to division (B) of this section exceeded the benefits associated with that design or formulation as determined pursuant to division (C) of this section;
>
> (2) It is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

*Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 529 (6th Cir. 2012) (quoting R.C. § 2307.75(A) (2001) (amended 2004)).  However, a subsequent statutory amendment that became effective in April 2005 deleted this test from the definition of a defectively designed product. *See Bouher v. Aramark Servs., Inc.*, 910 N.E.2d 40, 43 (Ohio Ct. App. 2009); Former R.C. 2307.75(A) (2004); R.C. § 2307.75; 2004 Ohio Laws File 144 (2003 Ohio SB 80).  Courts still apply the consumer expectation standard when the plaintiff's cause of action arose before the statutory amendment became effective. *See Ruff v. Wal-Mart Stores E., LP*, No. 2:07-cv-292, 2009 WL 3150319, at *4 (S.D. Ohio Sept. 30, 2009) (citing *Doty v. Fellhauer Elec., Inc.*, 888 N.E.2d 1138 (Ohio Ct. App. 2008)); *Newell Rubbermaid, Inc.*, 676 F.3d at 529; *Carroll v. Alliant Techsystems, Inc.*, No. 06AP-519, 2006 WL 3008472, at *2 n.2 (Ohio Ct. App. Oct. 24, 2009);

16

*Bouher*, 910 N.E.2d at 43; *Gumnitsky v. Delta Int'l Mach. Corp.*, 411 F. Supp. 2d 756, 762 (N.D. Ohio 2005) ("A 1996 amendment to the Ohio product liability code eliminated the consumer expectation test for product defect. However, the 1996 amendments were subsequently held unconstitutional. The Ohio product liability code has again been recently amended but these changes do not apply herein since the accident occurred in April 2003.").  *See also Hertzfeld v. Hayward Pool Prods, Inc.*, No. L-07-1168, 2007 WL 4563446, at *9 n.1 (Ohio Ct. App. Dec. 31, 2007) ("Since the common-law 'consumer expectation test' codified in R.C. 2307.75(A)(2) was stricken from the Ohio Products Liability Act by S.B. 80, the inclusion of R.C. 2307.71(B) abrogates the use of that common-law test for claims arising after April 7, 2005.").

Defendant has not challenged plaintiff's reliance on the consumer expectation standard. However, the Court notes that Michael and Alisha Baer moved into the premises in May or June 2005, *Bear Deposition*, *PAGEID* 744, 749-51, Mr. Baer's secretary purchased the heater in December 2006, *id.* at *PAGEID* 779-81, 785, 789, and the heater remote bears a date code of May 4, 2005. *Mid-West Forensic Services Report*, *PAGEID* 666.  All three events occurred after the consumer expectations standard was deleted from R.C. 2307.75.

Under the post-April 2005 version of R.C. 2307.75, a product may be defective in manufacture or construction, R.C. § 2307.74, in design or formulation, R.C. § 2307.75, due to inadequate warning or instruction, R.C. § 2307.76, or because it did not conform to a representation made by its manufacturer.  R.C. § 2307.77.  The *Complaint* asserts claims based on all four theories.  *See Complaint*, ¶¶ 12-15.  Nevertheless, *Plaintiff's Response* refers to defects generally and mentions only design and manufacturing defects in passing.  *Plaintiff's Response*, p. 9.  Accordingly, plaintiff has not raised a genuine issue of material fact and

17

defendant is entitled to judgment as a matter of law on plaintiff's claims under R.C. §§ 2307.76, 2307.77.

Under R.C. § 2307.75, a product is defective in design "if, at the time it left the control of its manufacturer, the foreseeable risks associated with its design . . . exceeded the benefits associated with that design."  R.C. § 2307.75(A).  In determining the foreseeable risks associated with a product's design, a court should consider the following list of non-exhaustive factors:

(1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;

(3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;

(4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer;

(5) The extent to which that design or formulation is more dangerous than a reasonably [sic] prudent consumer would expect when used in an intended or reasonably foreseeable manner.

R.C. § 2307.75(B) (footnote omitted).  The benefits associated with a product's design are determined by considering the following non-exhaustive factors:

(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;

(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;

(3) The nature and magnitude of any foreseeable risks associated with an alternative design or formulation.

18

R.C. § 2307.75(C). The statute also provides that a product is not defective in design if there was no "practical and technically feasible alternative design . . . that would have prevented the harm for which the claimant seeks to recover." R.C. § 2307.75(F). "Although this subsection does not state that it is a plaintiff's burden to prove an alternative design, the Sixth Circuit has so held." *Monroe v. Novartis Pharm. Corp.*, No. 1:12-cv-00746 WOB, 2014 WL 3378345, at *7 (S.D. Ohio July 10, 2014) (citing *McGrath v. Gen. Motors Corp.,* 26 F. App'x 506, 510 (6th Cir. 2002); *Jacobs v. E.I. du Pont de Nemours & Co.,* 67 F.3d 1219, 1242 (6th Cir. 1995)). In the case presently before the Court, plaintiff has failed to address the benefits and risks of the space heater's design, and it has failed to present any evidence of an alternative design for the space heater. Accordingly, defendant is entitled to summary judgment on plaintiff's claim under R.C. § 2307.75.

Under R.C. § 2307.74, a product is defective in manufacture or construction "if, when it left the control of its manufacturer, it deviated in a material way from the design specifications . . . or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications . . . or performance standards." R.C. § 2307.74. A party may establish that a product was defective through circumstantial evidence:

> If a claimant is unable because the manufacturer's product in question was destroyed to establish by direct evidence that the manufacturer's product in question was defective or if a claimant otherwise is unable to establish by direct evidence that the manufacturer's product in question was defective, then, consistent with the Rules of Evidence, it shall be sufficient for the claimant to present circumstantial or other competent evidence that establishes, by a preponderance of the evidence, that the manufacturer's product in question was defective in any one of the four respects specified [in the statute].

R.C. § 2307.73(B).

Here, Assistant Chief Wyse testified that he (and others) thought the fire started in the basement bedroom at or about where the space heater was located. *Wyse Deposition*, *PAGEID* 897-912. Mr. Pletcher and Mr. Gardner eliminated the house electrical wiring, the refrigerator and desk lamp in the basement bedroom, and "[n]atural type fire causes" as the cause of the fire. *Casalinova Report*, pp. 5-6. They also noted that there "was no evidence of an intentionally set fire," no sign of carelessly discarded smoking material, no evidence of candles in the basement bedroom, and no sign of a failure or malfunction in the stereo in the basement bedroom. *Id*. Mr. Pletcher and Mr. Gardner concluded that the fire originated in the basement bedroom "in the area of the space heater located centrally near the north wall." *Id*. They further concluded that, "based on the elimination and absence of all other heat sources in the area of origin, characteristics of this fire loss, and statements made by the insured, . . . the *most likely cause of this fire was a failure or malfunction of the space heater*." *Id*. (emphasis in original). As noted *supra*, Michael Parker performed a CT scan and destructive examination of the space heater and concluded that the fire was caused by an electrical event from within the space heater. *Mid-West Forensic Services Report*, *PAGEID* 672. Parker also eliminated consumer abuse or misuse as a cause of the fire because the electrical events occurred in spaces not accessible to a consumer. *Id*. Moreover, Michael Bear testified that he never had any issues with the space heater or experienced any strange smells or noises coming from the heater prior to the fire. *Bear Deposition*, *PAGEID* 785.

Considering the foregoing, the Court concludes that there is a genuine issue of material fact as to whether the space heater was defective and whether the defect was the cause of the fire. Ohio case law suggests that "a plaintiff is entitled to an inference of a manufacturing defect if the

defect is the type that could only have arisen during the manufacturing process or if the plaintiff

presents affirmative evidence that negates any act on his part that could have caused the defect."

*Harker v. Black & Decker (U.S.), Inc.*, 21 F.3d 427 (6th Cir. 1994) (citing *Cincinnati Ins. Co. v.*

*Volkswagen of Am., Inc.,* 502 N.E.2d 651 (Ohio Ct. App. 1985); *Nash v. Gen. Elec. Co.,* 410

N.E.2d 792 (Ohio Ct. App. 1979)).  Moreover, absent substantial change in the condition in

which the product was sold, it may be inferred that the defect was present when it left the hands

of the manufacturer; this can be established by demonstrating that the product was not tampered

with.  *See Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, 897 F. Supp. 2d 599, 610

(S.D. Ohio 2012); *Ruff v. Wal-Mart Stores E., LP*, No. 2:07-cv-292, 2009 WL 3150319, at *5

(S.D. Ohio Sept. 30, 2009).  As discussed *supra*, plaintiff has presented evidence that the fire

was caused by electrical arcing in an area of the space heater that is not accessible to a consumer.

Plaintiff has also presented evidence suggesting that the space heater had not been tampered with

by Mr. Baer.  Accordingly, the Court concludes that a reasonable jury could find in favor of

plaintiff based on the evidence presented.  *See Cincinnati Ins. Co.,* 502 N.E.2d at 655 (finding

that a reasonable jury could infer that a defect was present at the time the product left the

manufacturer, despite five years separating the date of manufacture and the fire that was

allegedly caused by the defect).

> **WHEREUPON**, defendant's motion *in limine*, ECF 40, is **DENIED**.  Defendant's

motion for summary judgment, ECF 44, is **GRANTED in part** and **DENIED in part**.

Defendant is entitled to summary judgment on plaintiff's claims under R.C. §§ 2307.75,

2307.76, and 2307.77. Plaintiff has presented evidence from which reasonable jurors could

conclude by the greater weight of the evidence that the heater was, under the standard set out in

R.C. § 2307.74, defective in manufacture or construction and whether the defect was the cause of the fire. Consequently, the motion for summary judgment is DENIED as to that claim.

s/Mark R. Abel
United States Magistrate Judge